OPINION
{¶ 1} Cecil W. Howard was found guilty by a jury in the Clark County Court of Common Pleas of attempted murder, aggravated robbery, and having weapons while under disability. The attempted murder and robbery counts each contained a firearm specification. Howard was sentenced to nine years of incarceration for attempted murder, nine years of incarceration for aggravated robbery, four years of incarceration for having a weapon while under disability, and three years of incarceration for the firearm specifications (which were merged), to be served consecutively, for a total term of twenty-five years. Howard appeals from his conviction and sentence.
 {¶ 2} According to the state's evidence, the Beverage Oasis Drive Through is located at 1953 South Yellow Springs Street in Springfield, Ohio, and is owned by Clifford Conley. To enter the drive through, customers in vehicles drive along the north side of the building and enter through the rear/west vehicle entrance. The automobiles then drive through the building and exit onto South Yellow Springs Street. The front/east side of the building has a separate pedestrian entrance; there is also a door from that store area into the drive through area. Pedestrian customers are not permitted in the drive through area. Conley has an office near the middle of the north side of the building. Nine security cameras have been placed throughout the drive through. Conley's office contains several monitors from which he can observe activities at the business.
 {¶ 3} On the night of June 22, 2002, Donald Little, Christopher Atchison, and Rebecca Stephson were working at the Beverage Oasis. Atchison's wife, Julie, was also in the front store area, waiting for her husband and Little to finish working for the night. At approximately 10:30 p.m., the employees heard a bell ring, indicating that a customer had entered the drive through. As Atchison went to the side door to go into the drive through area, two men wearing hooded jackets and gas masks and holding shotguns were at the door. Atchison held the door momentarily, said "we're being robbed," and told the others to run. Little and Julie ran out the front door, and Atchison followed. One of the robbers ran out the front door after them. Stephson hid in the storefront area. Conley saw these events on the monitors in his office, and he called 911.
 {¶ 4} Upon seeing the second robber attempt to open a cash register by hitting it with the butt of his shotgun, Conley decided "to stop him one way or the other." He grabbed his Ivers Johnson .22 caliber semiautomatic pistol and left his office. At this point, the second robber had left the front office and had trotted to the rear door, apparently looking for his partner. When Conley stepped into the drive through area from his office, the robber was outside the rear door, facing away from him. Conley said, "hold it," and fired one or two shots away from the robber. One bullet hit a cooler. The robber turned around and raised the shotgun as though to shoot Conley. Conley aimed at the widest part of the man's body and fired his weapon again. Apparently hit, the robber dropped his weapon, brought an arm into his stomach, and dropped onto one knee. Then he got up and headed north along the rear of the building, still holding his arm or stomach.
 {¶ 5} Conley walked up to the rear/west door. When he got there, he saw the robber's partner standing northwest of the building near an employee's car. The partner shot at Conley, who was able to duck out of the way. Conley returned fire and the partner shot at Conley again. Conley fired two more shots, but the partner was no longer holding his weapon to return the gunfire. Conley ran to the front of the building and closed the overhead doors to the drive through. The police arrived shortly thereafter.
 {¶ 6} While Conley was confronting the second robber, Little, Atchison and Julie ran to the road. After unsuccessfully attempting to stop a car passing by, an individual in a SUV stopped. Because the first robber was chasing them, the SUV backed up two to two and one half blocks. The driver dialed 911 and gave the phone to Little, who was in the front seat. Little testified that, a few minutes later, a maroon car drove up from the opposite direction. The car stopped, and a passenger in the back seat lowered his window halfway and smiled at him. The passenger said "go" and the car left. In November 2003, Little's wife left a message with the Springfield police that Howard was involved in the Beverage Oasis robbery and that her husband could identify the shooters.
 {¶ 7} On December 3, 2003, Howard was indicted for attempted murder with a firearm specification, aggravated robbery with a firearm specification, and having a weapon while under disability. On May 19, 2004, Little identified the passenger in the maroon car as Howard. (Little repeatedly indicated that he could not identify the robbers, because they had worn hoods and masks.) Shortly thereafter, Howard sought to suppress Little's identification. A hearing was held on June 2, 2004, and the motion was orally overruled. On June 2-4, 2004, Howard was tried by a jury. The jury found him guilty on all three counts, and he was sentenced accordingly.
 {¶ 8} Howard raises nine assignments of error on appeal.
 {¶ 9} "I. Appellant was denied his 14th amendment right to due process when the trial court overruled his motion to suppress unreliable eyewitness testimony."
 {¶ 10} In his first assignment of error, Howard claims that the trial court erred when it denied his motion to suppress the eyewitness identification by Donald Little. Howard claims that the identification was unreliable and was obtained by using impermissibly suggestive procedures.
 {¶ 11} "To warrant suppression of identification testimony, the accused bears the burden of showing that the identification procedure was `so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification' and that the identification itself was unreliable under the totality of the circumstances. Simmonsv. United States (1968), 390 U.S. 377, 384. See, also, Manson v.Brathwaite (1977), 432 U.S. 98, 106; Neil v. Biggers (1972), 409 U.S. 188,199; State v. Broom (1988), 40 Ohio St.3d 277, 284; State v. Moody
(1978), 55 Ohio St.2d 64, 67. As we stated in State v. Keene (Sept. 20, 1996), Montgomery App. No. 14375, unreported.
 {¶ 12} "`When an eyewitness to a crime is shown a series of photographs in an effort to identify a perpetrator, and the manner or mode of the presentation suggests that one individual is more likely than the others to be the perpetrator — such as when the photograph of one individual is in some way emphasized — undue suggestion may occur, increasing the likelihood of misidentification and violating the due process rights of a defendant so identified. Simmons v. United States
(1968), 390 U.S. 377; Neil v. Biggers (1972), 409 U.S. 188; State v.White (Feb. 2, 1994), Clark App. No. 3057, unreported. Identification testimony tainted by an unduly suggestive out-of-court identification procedure may be suppressed. However, even if an identification procedure is unduly suggestive, the identification testimony derived therefrom is not per se inadmissible solely for that reason. Reliability of the identification is the linchpin in determining its admissibility. Mansonv. Brathwaite (1977), 432 U.S. 98. As long as the identification itself is reliable, it is admissible despite the suggestive nature of the identification procedure. Neil v. Biggers, supra; Manson v. Brathwaite,supra; State v. Moody (1978), 55 Ohio St.2d 64 [9 Ohio Op.3d 71]; Statev. White, supra. Reliability is determined from the `totality of the circumstances,' which includes the witness' opportunity to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated, and the time between the crime and the identification procedure. Biggers, supra; Brathwaite, supra.'" State v. Robinson (Jan. 26, 2001), Montgomery App. No. 17393.
 {¶ 13} At the suppression hearing, Springfield police officer Darwin Hicks testified that he had been assigned to investigate the robbery at the Beverage Oasis on June 22, 2002. On May 17 or 18, 2004, he heard that Little could identify someone from the robbery. Hicks testified that he then spoke with Little, who described the passenger in the maroon car as a "big guy" with hair that "was kind of out and really wild." Hicks then assembled a photo lineup containing Howard and others individuals that a computer indicated had similar physical qualities. Hicks showed the photo array to Little on May 19, 2004. Hicks indicated that Little took "about a second" to identify Howard from the photo lineup. Little testified at the hearing that neither Hicks nor his wife did anything to suggest who he should pick from the lineup. Little signed the photo array after identifying Howard.
 {¶ 14} Howard asserts that the six photo lineup was unduly suggestive, because he was the only person who did not have closely cropped hair, he was only person that had a wide mustache, he was the only person that had a thick strip of hair running from his lower lip to his chin, he was the only man that had a mole on his forehead, and his eyes appeared to be sunken whereas the other men's eyes appeared to protrude. Howard also notes that the photographic lineup did not contain any pictures of men with wild hair.
 {¶ 15} As stated by the Eighth District, "[i]t is not a requirement for the use of photo arrays that all pictures shown must be of the same type. Neither is it required that they bear no differing marks or blemishes. Neither is it required that but one photo of an accused be used. The only inquiry is whether the photo or procedure used was `so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" State v. Green (1990),67 Ohio App.3d 72, 79, 585 N.E.2d 990, citing Simmons, 390 U.S. at 384. Moreover, "whether each and every suspect included in the photo array exactly matched the descriptions of witnesses to the crime is immaterial, as long as the array itself was not impermissibly suggestive." State v. Hubbard, Cuyahoga App. No. 83384, 2004-Ohio-4627, ¶ 22.
 {¶ 16} Upon review of the photo array, all the suspects were similar in appearance and build. Howard's complexion was typical of the other suspects. Each of the suspects had facial hair which, although not identical, was substantially similar. Howard's hair was not significantly longer than the other suspects. Viewing the array as a whole, we find nothing unduly suggestive about the selection of photographs.
 {¶ 17} Howard also asserts that Little's identification should have been suppressed, because it was unreliable. He notes that Little testified that he could not identify the robbers. Howard further notes that Little testified that he saw the passenger for two to five seconds on the night of the robbery, that the passenger was seated in an unlit car, and that the car's window was only down enough for Little to see the person's head. Little did not provide a detailed description to Hicks. Howard emphasizes that the identification did not occur until approximately twenty-three months after the robbery. Howard further argues that an identifier's confidence in his identification has a low correlation with accuracy and that Little made a cross-racial identification, which is generally less reliable.
 {¶ 18} The state responds:
 {¶ 19} "Mr. Little had ample opportunity to view the man in the car. He testified that he was only a few feet away from the car on a well lit street and had five seconds before the car pulled away. And while Mr. Little's description was not detailed it was accurate as to [Howard]. Mr. Little also testified that he had not said anything earlier because he had not immediately connected the two incidents, and had not been asked to do so by the investigating officers. So his opportunity to give a detailed description was limited not by his ability but by a lack of opportunity.
 {¶ 20} "Mr. Little has consistently held that he would recognize the man in the car. He quickly identified [Howard] in the line-up and remained steadfast in his conviction even through cross-examination at the suppression hearing and the trial." The state acknowledged the two year span of time between the incident and the identification but argued that "some people have a knack (for lack of a better term) for remembering faces."
 {¶ 21} As argued by the state, Little indicated that the passenger in the maroon car was no more than four or five feet away, that he "could see real good," and that the car was stopped "long enough for me to look at this guy." Little had told Hicks that he would be able to identify the passenger if he saw him again. The identification on May 19, 2004, took "about a second." We note that no expert testimony was presented at the suppression hearing or at trial regarding the reliability of Little's eyewitness identification or of eyewitness identifications in general.
 {¶ 22} The nearly two year delay between the robbery and Little's identification is clearly problematic. As stated by the United States Supreme Court, even a seven month lapse "would be a seriously negative factor in most cases." Bigger, 409 U.S. at 201. However, we find it inappropriate to establish a bright line test for when an identification is unreliable due to the span of time between the crime and the identification. Several courts have found that lengthy delays go only to the weight of the testimony — a question for the jury — and do not destroy the witness's credibility. See People v. Rodgers (Ill. 1972),290 N.E.2d 251 (more than two-year lapse in time before identification did not render the identification incredible); State v. Stewart (La. 1980), 389 So.2d 1321 (thirteen month delay did not render identification unreliable).
 {¶ 23} In the present case, Little told Hicks that he would be able to identify the passenger in the maroon car — even after an almost two year delay. Little identified Howard immediately upon looking at a photo array that was not unduly suggestive. At the suppression hearing, Little tried to explain how he could remember Howard's face by describing the physical appearance and clothing of individuals who had previously robbed the Beverage Oasis. When asked how the passenger's face was "still in your mind," Little responded "It's stuck there." The fact that Little identified an individual whose fingerprint was on a weapon which was used in the robbery supports the reliability of the identification. Moreover, there is no evidence that events occurring between the robbery and the identification affected Little's memory. Although Howard's likeness was published in the newspaper and appeared on the local news following his arrest, Little indicated that he did not read the newspaper or watch the local news on a regular basis and he denied having seen news reports concerning the robbery. Accordingly, looking at the totality of the circumstances, we find that Little's identification was sufficiently reliable to warrant presentation to the jury. The trial court did not err in overruling Howard's motion to suppress.
 {¶ 24} The first assignment of error is overruled.
 {¶ 25} "II. The trial court committed harmful error when it refused to deliver proper jury instructions regarding eyewitness testimony, as requested by appellant."
 {¶ 26} In his second assignment of error, Howard claims that the trial court erred when it refused to issue a proper Telfaire jury instruction concerning eyewitness identifications.
 {¶ 27} In United States v. Telfaire (C.A.D.C. 1972), 469 F.2d 552, the court of appeals set forth a model special instruction on identification, which it attached as an appendix to its opinion. In its entirety, the model instruction reads:
 {¶ 28} "One of the most important issues in this case is the identification of the defendant as the perpetrator of the crime. The Government has the burden of providing identity, beyond a reasonable doubt. It is not essential that the witness himself be free from doubt as to the correctness of his statement. However, you, the jury, must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you may convict him. If you are not convinced beyond a reasonable doubt that the defendant was the person who committed the crime, you must find the defendant not guilty.
 {¶ 29} "Identification testimony is an expression of belief or impression by the witness. Its value depends on the opportunity the witness had to observe the offender at the time of the offense and to make a reliable identification later.
 {¶ 30} "In appraising the identification testimony of a witness, you should consider the following:
 {¶ 31} "(1) Are you convinced that the witness had the capacity and an adequate opportunity to observe the offender?
 {¶ 32} "Whether the witness had an adequate opportunity to observe the offender at the time of the offense will be affected by such matters as how long or short a time was available, how far or close the witness was, how good were lighting conditions, whether the witness had had occasion to see or know the person in the past.
 {¶ 33} "[In general, a witness bases any identification he makes on his perception through the use of his senses. Usually the witness identifies an offender by the sense of sight — but this is not necessarily so, and he may use other senses.][1]
 {¶ 34} "(2) Are you satisfied that the identification made by the witness subsequent to the offense was the product of his own recollection? You may take into account both the strength of the identification, and the circumstances under which the identification was made.
 {¶ 35} "If the identification by the witness may have been influenced by the circumstances under which the defendant was presented to him for identification, you should scrutinize the identification with great care. You may also consider the length of time that lapsed between the occurrence of the crime and the next opportunity of the witness to see defendant, as a factor bearing on the reliability of the identification.
 {¶ 36} "[You may also take into account that an identification made by picking the defendant out of a group of similar individuals is generally more reliable than one which results from the presentation of the defendant alone to the witness.]
 {¶ 37} "[(3) You make take into account any occasions in which the witness failed to make an identification of defendant, or made an identification that was inconsistent with his identification at trial.]
 {¶ 38} "(4) Finally, you must consider the credibility of each identification witness in the same way as any other witness, consider whether he is truthful, and consider whether he had the capacity and opportunity to make a reliable observation on the matter covered in his testimony.
 {¶ 39} "I again emphasize that the burden of proof on the prosecutor extends to every element of the crime charged, and this specifically includes the burden of proving beyond a reasonable doubt the identity of the defendant as the perpetrator of the crime with which he stands charged. If after examining the testimony, you have a reasonable doubt as to the accuracy of the identification, you must find the defendant not guilty." Telfaire, 469 F.2d at 558-559 (footnote in original).
 {¶ 40} During the course of the trial, Howard's counsel requested that the trial court issue the Telfaire charge verbatim. The court overruled the motion on the ground that the court's charge, which was taken from Ohio Jury Instructions, substantially covered the charge requested by Howard.
 {¶ 41} The Ohio version of the Telfaire instruction, 4 Ohio Jury Instructions (2004) 41, Section 405.20(5), lists several factors that juries "may consider in weighing the testimony of identifying witness(es)," to wit:
 {¶ 42} "1. Capacity of the witness, that is, the (age) (intelligence) (defective senses, if any,) and the opportunity of the witness to observe.
 {¶ 43} "2. The witness' degree of attention at the time he observed the offender.
 {¶ 44} "3. The accuracy of the witness' prior description (or identification, if any).
 {¶ 45} "4. Whether witness had had occasion to observe defendant in the past.
 {¶ 46} "5. The interval of time between the event and the identification.
 {¶ 47} "6. All surrounding circumstances under which witness has identified defendant (including deficiencies, if any, in lineup, photo display or one-on-one)."
 {¶ 48} It further provides: "If, after examining the testimony of the identifying witness you are not convinced beyond a reasonable doubt the defendant is the offender, you must find defendant not guilty."
 {¶ 49} The trial court's eyewitness identification charge largely mirrored the OJI instruction. The court, however, omitted the third and fifth factors for consideration, i.e., the accuracy of the prior description and the interval of time between the event and the identification. The court also omitted the sixth factor's parenthetical reference to deficiencies in the photo display. Howard asserts that the trial court committed prejudicial error when it failed to instruct the jury that it could consider the interval of time between the robbery and Little's identification.
 {¶ 50} The decision of whether to give a Telfaire instruction is a matter within the sound discretion of the trial court that depends "in large measure on whether a resolution by the jury of the disputed issues in the case requires or will be clearly assisted by the instruction."State v. Guster (1981), 66 Ohio St.2d 266, 271, 421 N.E.2d 157; State v.Blackburn (Aug. 28, 1998), Greene App. No. 97 CA 100. The supreme court has held: "A trial court is not required in all criminal cases to give a jury instruction on eyewitness identification where the identification of the defendant is the crucial issue in the case and is uncorroborated by other evidence. A trial court does not abuse its discretion in deciding that the factual issues do not require, and will not be assisted by, the requested instructions, and that the issue of determining identity beyond a reasonable doubt is adequately covered by other instructions." Guster,
supra, at syllabus.
 {¶ 51} In the present case, we agree with the state that the trial court's instruction was sufficient to encompass the length of time that lapsed between the robbery and Little's identification. The court instructed the jury that it could consider "all surrounding circumstances under which the witness had identified the defendant," in addition to several other factors. The court did not imply that "surrounding circumstances" was limited to the manner in which he was asked by the police to identify Howard, i.e., the photo array. We note that Howard's defense counsel emphasized during Hick's and Little's cross-examinations and during closing argument that the identification occurred nearly two years after the robbery. Accordingly, the jury was put on notice by the defense that the identification may be less reliable due to a lapse in time. Under the circumstances, we find no evidence that the trial court's instruction was prejudicial.
 {¶ 52} The second assignment of error is overruled.
 {¶ 53} "III. Appellant was denied a fair trial as a result of the trial court allowing the state to show a photograph in open court of appellant wearing jail garb."
 {¶ 54} In his third assignment of error, Howard contends that he was denied his right to a fair trial, in violation of theFourteenth Amendment to the United States Constitution, when the trial court permitted the state to show a photograph of him wearing jail garb. Howard cites Estelle v. Williams (1976), 425 U.S. 501, in which the Supreme Court indicated that a defendant's right to a fair trial is violated when he is compelled to appear at trial wearing a jail clothing.
 {¶ 55} During the state's case, Jeffrey Steinmetz, a Springfield police officer with the Crime Scene Collections Unit, testified that he was asked to go to the Clark County Jail third floor nurse's station to take photographs of any scars or marks on Howard's body. The prosecution asked the officer to identify three photographs, the first of which showed Howard at the Clark County Jail nurse's station in jail clothing. The photograph was displayed for a few minutes, after which the officer was asked to identify photographs of a scar on Howard's left buttocks, which was possibly caused by a bullet wound.
 {¶ 56} We do not find that the alleged prejudice from photograph at issue is comparable to the concerns expressed in Williams. The photograph was displayed for a very short time, and the jury had been aware that Howard had been incarcerated. In addition, the court gave a limiting instruction that "[e]vidence that showed the defendant in jail clothing is not to be considered for any purpose." Howard's right to fair trial was not violated.
 {¶ 57} The third assignment of error is overruled.
 {¶ 58} "IV. Appellant was denied his 6th amendment right to confront witnesses when the trial court did not provide his counsel the opportunity to re-cross examine an alleged eyewitness after the state re-direct examined the witness."
 {¶ 59} In his fourth assignment of error, Howard contends that hisSixth Amendment right to confront witnesses was violated when the trial court denied him the opportunity to re-cross examine Little after the prosecution asked him during redirect examination whether he had told anyone that he could identify someone he saw on June 22, 2002.
 {¶ 60} During redirect examination, the prosecutor and Little had the following exchange:
 {¶ 61} Prosecutor: "Now, is it possible that you told someone that you could identify somebody that you saw that night —"
 {¶ 62} Def. Counsel: "Objection."
 {¶ 63} Prosecutor: "— and they told the police?"
 {¶ 64} Defense Counsel: "Objection."
 {¶ 65} Court: "Sustained."
 {¶ 66} Prosecutor: "That's exactly what he's been trying to get out of this guy."
 {¶ 67} Court: "Sustained."
 {¶ 68} Prosecutor: "Is it possible?"
 {¶ 69} Defense Counsel: "Objection."
 {¶ 70} Court: "Sustained."
 {¶ 71} Prosecutor: "Okay. Do you remember telling anybody that you could identify someone that you saw on June 22?"
 {¶ 72} Little: "I don't, no. Could be, to be honest with you."
 {¶ 73} Prosecutor: "And if you did, could you have forgotten?"
 {¶ 74} Defense Counsel: "Objection."
 {¶ 75} Court: "Sustained."
 {¶ 76} Little: "It's a possibility. I mean, I just don't remember."
 {¶ 77} Court: "The objection is sustained. Jurors will disregard."
 {¶ 78} Prosecutor: "Okay. I have no further questions."
 {¶ 79} Court: "All right. Thank you. You may step down."
 {¶ 80} Viewing this exchange as a whole, the court did not permit the state to delve into whether Little had told anyone that he could identify someone he saw on June 22, 2002. The court repeatedly sustained defense counsel's objections. The one answer that Little provided added nothing to his prior testimony. We note that defense counsel did not request an opportunity to re-cross examine Little when the court gave him permission to leave the witness stand. Howard's argument is without merit.
 {¶ 81} The fourth assignment of error is overruled.
 {¶ 82} "V. The verdict and judgment of conviction of the trial court is against the manifest weight of the evidence."
 {¶ 83} In his fifth assignment of error, Howard claims that his conviction is against the manifest weight of the evidence. When a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541, citingState v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility. State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288. "Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." Id. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. Martin,20 Ohio App.3d at 175.
 {¶ 84} Howard concedes that the state presented sufficient evidence to convict him. As stated by Howard, the state focused on three pieces of evidence. First, the police recovered one of the shotguns that was used in the robbery at the scene. A fingerprint belonging to Howard was found on the loading tube of the shotgun found at the Beverage Oasis. George Remmers testified that he had lent the shotgun to Kerry Perez prior to the robbery; Debra Perez, Kerry's wife, testified that the shotgun recovered from the Beverage Oasis was the one her husband had gotten from Mr. Remmers. Mrs. Perez also testified that she and her husband socialized with Howard and his wife.
 {¶ 85} The state offered additional evidence that Howard had sustained a bullet wound. Several witnesses testified that a visual examination and x-rays were taken of Howard. Dr. Rick Kukulka, a radiologist at Community Hospital, testified that a number of metallic objects — typical of bullet fragments — were found at Howard's left hip area. Dr. Kukulka could not, however, testify as to the type of bullet or weapon that was used nor could he indicate when the injury occurred, except to say that it was an "old" injury.
 {¶ 86} Finally, Little identified Howard as the passenger in a maroon car which passed him and other employees shortly after the gunfire ceased at the Beverage Oasis.
 {¶ 87} Howard asserts that the state's evidence should be disregarded. As stated, supra, he contends that Little's eyewitness identification is unreliable. Howard further argues that his fingerprint could have been on the shotgun because, as Mrs. Perez testified, Kerry Perez "liked to let people know what he had" and Howard could have handled the gun another time. Howard further asserts that it is "incomprehensible" that only one partial fingerprint would have been lifted from the shotgun unless the robber had been wearing gloves. As to the bullet wound, Howard emphasizes that there is no indication as to when the wound occurred and what caused the wound. Howard further emphasizes that his wound is located in his buttocks whereas Conley had testified that he had shot the robber when he was turning to face him. He notes that no DNA evidence was recovered at the scene.
 {¶ 88} Although the jury could have found the state's evidence to be incredible or unpersuasive, it was not required to do so. The jury could have easily concluded that Howard's fingerprint was found on the shotgun because he had participated in the robbery. The jury likewise could have found Little's identification of Howard to be credible and reliable. Based on this evidence, the jury reasonably could have concluded that Howard was one of the two robbers of the Beverage Oasis. We afford great deference to the factfinder's credibility determinations. See State v.Sherrill (Jan. 28, 2000), Montgomery App. No. 17359; State v. Reed,155 Ohio App.3d 435, 445, 2003-Ohio-6536, 801 N.E.2d 862. Thus, we cannot conclude that the jury clearly lost its way in reaching its conclusions. Accordingly, upon review of the record, Howard's conviction was not against the manifest weight of the evidence.
 {¶ 89} The fifth assignment of error is overruled.
 {¶ 90} "VI. The state's inferences that appellant was guilty due to his association with kerry perez constituted prosecutorial misconduct that was prejudicial to appellant."
 {¶ 91} In his sixth assignment of error, Howard claims that the prosecutor wrongfully implied that he was guilty due to his association with Kerry Perez.
 {¶ 92} In analyzing claims of prosecutorial misconduct, the test is "whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." State v. Jones,90 Ohio St.3d 403, 420, 2000-Ohio-187, 749 N.E.2d 300, citing State v.Smith (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883. "The touchstone of analysis `is the fairness of the trial, not the culpability of the prosecutor.'" Id., quoting Smith v. Phillips (1982), 455 U.S. 209, 219,102 S.Ct. 940, 947, 71 L.Ed.2d 78. Where it is clear beyond a reasonable doubt that a jury would have found the defendant guilty even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. See State v. Loza (1994),71 Ohio St.3d 61, 78, 1994-Ohio-409, 641 N.E.2d 1082. In reviewing allegations of prosecutorial misconduct, we review the alleged wrongful conduct in the context of the entire trial. Darden v. Wainwright (1986),477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144.
 {¶ 93} Howard claims that the prosecution attempted to demonstrate that he was a robber of the Beverage Oasis because he was an associate of Perez. He focuses on the testimony of Debra Perez, in which she indicated that Howard was a friend of her husband. Mrs. Perez testified that her husband went out sometime between 7:00 pm. and 9:00 p.m. on June 22, 2002. When he returned home after midnight, he had been shot in his right arm. Perez did not want to go to the hospital and asked his wife to "tie this off." Mrs. Perez identified the shotgun that was found at the Beverage Oasis as a weapon that her husband had borrowed from George Remmers. She testified that she had not seen the shotgun since the robbery. Howard indicates in his brief that Perez has confessed to committing the Beverage Oasis robbery; as acknowledged by Howard, that fact is not in the record.
 {¶ 94} The Supreme Court of Ohio has recognized that arguing a defendant's guilt based on his association with others is a "thoroughly discredited doctrine" which violates a "fundamental principle of American jurisprudence." State v. Keenan (1993), 66 Ohio St.3d 402, 409,613 N.E.2d 203 (citations omitted). It stated: "A defendant cannot be adjudged guilty on the ground that he or she associates with bad people. Such arguments are highly prejudicial." Id.
 {¶ 95} Although Mrs. Perez's testimony implicated her husband in the Beverage Oasis robbery, it also served to establish Howard's connection with the shotgun. In light of the fact that the Beverage Oasis robbery was committed by two individuals and that Howard's fingerprint was found on the shotgun, the state was permitted to present evidence that the shotgun had been in the possession of an individual who was known to Howard and may also have been involved in the Beverage Oasis robbery. The state did not argue that it was more probable that Howard participated in the Beverage Oasis robbery merely because he was a friend of an individual who likely was involved in that crime.
 {¶ 96} Howard also asserts that the prosecutor engaged in misconduct when he referred to Howard and Perez as "a team." Howard argues that, by improperly stating during closing argument that he and Perez were a team, the prosecutor improperly encouraged the jury to convict him based on the overwhelming evidence that Perez was one of the robbers.
 {¶ 97} Generally, prosecutors are entitled to considerable latitude in opening statement and closing argument. State v. Ballew, 76 Ohio St.3d 244,255, 1996-Ohio-81, 667 N.E.2d 369; State v. Stevens, Montgomery App. No. 19572, 2003-Ohio-6249, ¶ 34. In closing argument, a prosecutor may comment freely on "what the evidence has shown and what reasonable inferences may be drawn therefrom." State v. Lott (1990),51 Ohio St.3d 160, 165, 555 N.E.2d 293, quoting State v. Stephens
(1970), 24 Ohio St.2d 76, 82, 263 N.E.2d 773. "Moreover, because isolated instances of prosecutorial misconduct are harmless, the closing argument must be viewed in its entirety to determine whether the defendant has been prejudiced." Stevens, supra, citing Ballew, supra, and State v.Lorraine (1993), 66 Ohio St.3d 414, 420, 613 N.E.2d 212.
 {¶ 98} Howard challenges the prosecutor's closing argument, in which he stated, in part:
 {¶ 99} "Now, Mr. Conley's talking about the shotgun being reeled around and we — when we find the shotgun from later testimony, we've about got it in this position with round in the chamber. So the shotgun is coming around and what we have so we've got something reeling around in all probability in this direction; and we have a gunshot wound that we later find out is to the hip or is the buttock, in the rear.
 {¶ 100} "Now, why this gets important and also has the opportunity for the confusion by you is we're talking about a robbery team here. We are talking about two individuals with the same purpose working together to commit a crime. We're talking about two individuals that are also shot. You find that out in later testimony.
 {¶ 101} "Now, I always like to go back to the instructions of the Court; and you will hear in the instructions of the Court that when two or more individuals commit a crime with a common purpose and one person does one part and the other person does another part, both are equally responsible.
 {¶ 102} "And that is extremely important. Because there may — and I'll discuss a little bit later — there may be some interpretation that you have to do is to whether the man that gets shot at that point in the — in the proceedings is Mr. Howard or whether it's Mr. Perez. But it doesn't make any difference because, ladies and gentleman, because under the law, they're working as a team; and when one person does one part and another person does another part, they're equally guilty. They're equally responsible.
 {¶ 103} "Now, what does Mr. Conley tell you after that? He says he thought he shot the individual in the abdomen, goes down to one knee; and the shotgun is dropped. Now, what is that indicative of? That is more indicative of a wound to the hip than a wound to the arm.
 {¶ 104} "* * * He tells you further about a further gunfire.
 {¶ 105} "And before he gets to that further gunfire, he has two shotgun blasts that are directed where he is. In fact, he tells you if he hadn't ducked, these would have been in his head. * * *
 {¶ 106} "We've got two individuals working as a team. * * *
 {¶ 107} "Is it possible at that point in time that Mr. Howard could have been shot with that shot? The circumstances doesn't seem as likely; but, yes, it is. But, once again, it doesn't make any difference as to whether Kerry Perez is in Position 1 or whether Cecil Howard is in Position 1 or whether Kerry Perez is in Position 2 or Cecil Howard is in Position 2 because they are a team. They are a team."
 {¶ 108} Upon review of the closing argument, the prosecutor did not encourage the jury to convict Howard based on the evidence against Perez. Rather, the prosecutor argued that the culpability of two individuals who act in concert is equivalent. In other words, the prosecutor asserted that it did not matter whether Howard or his partner shot at Conley; so long as they acted in concert, Howard and his partner were responsible for the acts of the other. We find nothing improper in this argument.
 {¶ 109} The sixth assignment of error is overruled.
 {¶ 110} "VII. Appellant was denied his right to a fair trial when the prosecution was permitted to present prejudicial evidence of appellant's previous conviction for aggravated robbery."
 {¶ 111} In his seventh assignment of error, Howard claims that the trial court erred when it permitted the prosecution to present cumulative evidence that Howard had previously been convicted of aggravated robbery.
 {¶ 112} Count Three of the indictment charged Howard with having a weapon while under disability, in violation of R.C. 2923.13(A)(2). In 2002, that statute read: "Unless relieved from disability as provided in section 2923.14 of the Revised Code, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * (2) The person is under indictment for or has been convicted of any felony offense of violence * * *." R.C. 2923.13(B) further provided: "No person who has been convicted of a felony of the first or second degree shall violate division (A) of this section within five years of the date of the person's release from imprisonment or from post-release control that is imposed for the commission of a felony of the first or second degree."
 {¶ 113} Howard's indictment alleged that he had a weapon within five years of his release from imprisonment for aggravated robbery. To prove that charge, the state presented the evidence of Ronald Vincent and Samuel Stucky. Ronald Vincent, the clerk of courts for Clark County, testified that he was the custodian of all records of the Clark County court of common pleas and court of appeals. He provided a certified copy of the judgment entry of conviction of Howard for aggravated robbery with a gun specification in a prior criminal case, Case No. 85-CR-290. Vincent also testified that there is no record that Howard had been relieved from his disability which prohibited him from carrying a firearm. Samuel Stucky of the Ohio Parole Authority presented a certificate of parole, which demonstrated that Howard had been released on September 1, 2000. Stucky also identified Howard as the individual who had been released on parole following a conviction in Clark County Case No. 85-CR-290.
 {¶ 114} Howard contends that the trial court should have excluded Vincent's and Stucky's testimony pursuant to Evid.R. 403(A). He argues that Stucky's testimony should have been excluded altogether and that Vincent should not have been allowed to testify that he was convicted of aggravated robbery with a gun specification. Howard argues that the certified copy of the entry of judgment in the prior criminal action along with evidence sufficient to identify him as the individual named in the entry was sufficient. See State v. Shackleford (Aug. 3, 2001), Montgomery App. No. 18560; R.C. 2945.75(B).
 {¶ 115} We do not find that the testimony of Vincent and Stucky was cumulative or unduly prejudicial. Their testimony provided evidence of the prior conviction, his release within five years of the current charge, and confirmation of his identity. The evidence that Howard had previously been convicted of aggravated robbery established that he had committed a felony of the first or second degree, which was also an offense of violence.
 {¶ 116} The seventh assignment of error is overruled.
 {¶ 117} "VIII. The cumulative effects of the errors committed during the trial constituted harmful error thereby denying appellant his right to a fair trial."
 {¶ 118} Under Howard's eighth assignment of error, he argues that the cumulative weight of the errors denied him a fair trial. In addition, he claims that he was prejudiced by the trial court's decisions to permit the prosecution to test the shotgun that was found at the scene and to reopen its case and by his counsel's failure to call two defense witness.
 {¶ 119} "The question of opening up a case for the presentation of further testimony is within the sound discretion of the trial court, and the court's action in that regard will not be disturbed on appeal unless under the circumstances it amounted to an abuse of discretion." Columbusv. Grant (1981), 1 Ohio App.3d 96, 97, 439 N.E.2d 907; see State v.Gaskins, Seneca App. No. 13-04-12, 2004-Ohio-5427, ¶ 18. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 450 N.E.2d 1140; Statev. Myers, 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, at ¶ 75.
 {¶ 120} In the present case, the court permitted the state to recall Todd Robinson, an Assistant Forensic Criminalist for the Springfield Crime Laboratory. Robinson testified that, within the last ten minutes, he had taken the shotgun found at the Beverage Oasis to the crime laboratory and performed tests to ascertain whether the gun would operate. Robinson indicated that the weapon was in good operating condition. The defense had objected to the state being permitted to test the firearm after it had rested its case, arguing that the evidence was not developed prior to that time.
 {¶ 121} We find no abuse of discretion in allowing the state to belatedly present evidence of the shotgun's operability. The state indicated that the shotgun had previously been tested by an individual who was no longer in the court's jurisdiction and that defense counsel had received a report from that individual as to the gun's operability. Thus, defense counsel should not have been surprised by this additional evidence.
 {¶ 122} In addition, although the state had not presented direct evidence that the shotgun was operable, the state had previously presented sufficient evidence during its case-in-chief to support that conclusion. As stated by the supreme court in State v. Thompkins,78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, "it should be abundantly clear that where an individual brandishes a gun and implicitly but not expressly threatens to discharge the firearm at the time of the offense, the threat can be sufficient to satisfy the state's burden of proving that the firearm was operable or capable of being readily rendered operable." Id. at 384; see State v. Nelson (Aug. 18, 1995), Montgomery App. No. 14775 (indicating that an implied threat may support an inference that the apparent firearm is operable). The state had presented evidence that a robber had begun to turn around and to raise the shotgun as though to shoot Conley. Such evidence was sufficient to find that the weapon was operable. Accordingly, the additional evidence was not prejudicial to Howard.
 {¶ 123} Turning to the conduct of Howard's defense counsel, Howard claims that his counsel was ineffective, because he failed to call two witnesses who could have testified to his physical well-being in the days following the Beverage Oasis robbery. In order to demonstrate ineffective assistance of counsel, Howard must establish that his counsel's representation fell below an objective standard of reasonableness and that he has been prejudiced by his counsel's deficient performance, i.e., that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different.Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052,80 L.Ed.2d 674; State v. Bradley (1989), 42 Ohio St. 3d 136,538 N.E.2d 373. Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. See Strickland, 466 U.S. at 689. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. See id.; State v. Parker, Montgomery App. No. 19486, 2003-Ohio-4326, ¶ 13. "The failure to present the testimony of a witness or other evidence at trial is not a substantial violation of an essential duty to a defendant unless it is shown that the evidence would have assisted the defense."State v. Payne (Mar. 1, 1996), Greene App. No. 95-CA-49; State v.Farris, Clark App. No. 2003-CA-77, 2004-Ohio-5980, at ¶ 59.
 {¶ 124} Here, there is no evidence in the record that these witnesses would have appeared at trial and would have testified as Howard suggests. Moreover, even if they would have testified that Howard was uninjured after the robbery, the jury might have still believed that Perez had been holding the recovered shotgun during the robbery and that Howard had been the partner who later shot at Conley. Because we can only speculate as to the these witnesses' testimony, whether that testimony would have been favorable to Howard, and the testimony's impact on the jury, we cannot conclude that the failure to call them to testify was prejudicial to Howard.
 {¶ 125} In sum, we have not identified any prejudicial errors. Accordingly, we find no basis for reversal due to cumulative error.
 {¶ 126} The eighth assignment of error is overruled.
 {¶ 127} "IX. The trial court erred when it sentenced appellant contrary to law and the sentence is not supported by the record." In his ninth assignment of error, Howard claims that the trial court imposed a sentence that was unsupported and contrary to the law. Howard argues that the court considered facts that were not in the record and drew conclusions that were not supported by the evidence. Howard cites to the judge's statements that the witnesses to the robbery "would have psychological difficulties and nightmares," that Perez gave the shotgun to Howard, and that Howard planned the robbery by purchasing masks, clothing and weapons. Howard requests his sentence be modified or remanded for resentencing.
 {¶ 128} At the outset, we note that the trial court did not impose the maximum sentence permitted for attempted murder, aggravated robbery, and having a weapon while under disability. Although the court found Howard's behavior to be "totally despicable," it found that he had not committed the worst form of the offense. However, the court imposed consecutive sentences for these offenses as well as the mandatory three year sentence for the firearm specification. Howard was sentenced to a total of twenty-five years of incarceration.
 {¶ 129} Statutory law requires certain findings if consecutive sentences are to be imposed. R.C. 2929.14(E)(4) provides:
 {¶ 130} "If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 {¶ 131} "(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 {¶ 132} "(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
 {¶ 133} "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."
In sentencing Howard, the trial court stated, in part:
 {¶ 134} "Now, I will make findings on the record to indicate the Court's reasoning and the sentencing factors that the Court considered in imposing these sentences.
 {¶ 135} "The Court looked at the situation of the victims here. We have a shop owner, proprietor of the Oasis beverage establishment who's in his 60s, approximately 62, 63 years old. And we have four employees in addition to the owner, Mr. Conley; and those four employees were absolutely terrified by the conduct of the defendant. They — three of them fled out the door. One of them hid on the floor, and one person never returned to work following this incident.
 {¶ 136} "I look at the defendant as a healthy, strong individual, very muscular, certainly able bodied, capable of employment, supporting himself or doing something constructive with his life. He's done none of that.
 {¶ 137} "And he attempts to rob four or five people who work for fairly minimum wage at the lower end of the income schedule, and devote their life to working day after day paying taxes and leading law-abiding lives.
 {¶ 138} "Here's a defendant who walks in on them, then threatens their livelihood. This is an economic loss to a business, perhaps only a few hundred dollars on this occasion; but as the owner testified, it affects his business when he gets robbed. People don't want to come there. That's his livelihood. He works hard as to [sic] all of this employees, and then they're simply terrorized by a person who makes no contribution at any time in his life to doing anything worthwhile.
 {¶ 139} "* * *
 {¶ 140} "It's just seems like a total waste to society to have Mr. Howard among us; and if he wants to waste his life, that's fine. But he's terrorized these people who now would have psychological difficulties and nightmares from the conduct of the defendant in this attempted and botched robbery.
 {¶ 141} "You review the evidence in the case, the defendant is there with a shotgun. This shotgun that was borrowed from Mr. Atchison (SIC) by the defendant's friend, Mr. Perez. * * *
 {¶ 142} "I think that I mentioned the factors of the age of the one of the victims, Mr. Conley, the psychological impact on all five fo the employees of the Beverage Oasis store. I would also mention that the defendant did act with a plan or a scheme in that they purchased gas masks or painters masks or some clothing to distort their identity, and it shows a planned activity rather than just a spur of the moment thing. In other words, the defendant planned this robbery by the purchase of the gas masks and the weapons that were involved; and it happens right at closing time so that it clearly implicates that this was a planned criminal activity.
 {¶ 143} "I would also like to mention in factors the defendant's criminal history. He was convicted of aggravated robbery in '85 and went to prison, I believe in '86, 1986, from this court and served 14 years at the state penitentiary.
 {¶ 144} "And then upon his release in 2000, he has done nothing to indicate that he has been rehabilitated or that he has responded favorably to any sanctions that were imposed by the Court, and I mentioned that there is no genuine remorse; and I would like to cite, perhaps, one of the most significant factors that this offense was committed while the defendant was on parole and under Post Release Control sanctions.
 {¶ 145} "Because I think that factor qualifies this case to be sentenced as a case requiring consecutive prison terms. The Court is finding that in order to protect the public, it is necessary that consecutive sentences be imposed and that it is necessary to punish the defendant and that it is not disproportionate to his conduct and the danger which he posed.
 {¶ 146} "I also find that the crime was committed while under Post Release Control or parole in this situation and that the harm was so great or unusual that a single term would not adequately reflect the seriousness of the defendant's conduct, and I look at the fear that he inflicted on four or five people. It was only by the grace of God that one of the people, particularly Mr. Conley, was not murdered or suffered serious physical harm. * * *
 {¶ 147} "I further find that the defendant's criminal history — and I mention the conviction for aggravated robbery — shows that consecutive terms are needed to protect the public because it seems apparent to me and anybody that would review this case that the defendant has no intention of being a law-abiding citizen. * * *"
 {¶ 148} Upon review of the record, we find that the judge's reasons about which Howard complains in his appellate brief were reasonably inferred from the record. Although there was no direct testimony that Perez gave the shotgun to Howard, Mrs. Perez and Mr. Remmers both testified that Perez borrowed the shotgun from Remmers. Based on the fact that Howard's fingerprint was on the shotgun and that Little identified Howard as the passenger in the maroon car immediately following the robbery, it is a reasonable inference that Perez gave the shotgun to Howard to use in the robbery.
 {¶ 149} Howard mischaracterizes the court's reasoning when he states that the judge "also stated that Appellant planned the robbery by purchasing masks, clothing and weapons." Rather, the court noted that the masks and weapons had been obtained prior to the crime,
 {¶ 150} thus indicating the robbery had been planned and not "spur of the moment." Although the record suggests that Perez obtained the masks and weapons, the record supports the court's conclusion that Perez and Howard had acted together and the robbery was premeditated.
 {¶ 151} Lastly, although there was no evidence at trial as to the psychological harm that the employees of the Beverage Oasis suffered, the court reasonably inferred that they were "terrorized" by the robbers. The record indicates that two men, wearing masks and armed with shotguns, came to the door of the front store area. As noted by the trial court, when the Atchisons and Little ran from the store, they were chased by one of the armed robbers. Rebecca Stephson, who hid, would have heard a robber hitting a cash register with his weapon and the gunfire between the robbers and Conley. Conley testifed that Stephson quit shortly after the robbery. Conley also testified that a shot from one of the robbers would have hit him in the head if he had not moved. From this testimony, the court could reasonably conclude that the employees and the owner were fearful during the robbery and that the robbery might have had some lingering psychological effects.
 {¶ 152} Howard has filed a Notice of Intent to Present Authorities Not Cited in Appellant's Brief, which advances an argument under Blakely v.Washington (2004), ___ U.S. ___, 124 S.Ct. 2531, 159 L.E.2d 403. Howard claims that the court's imposition of consecutive sentences under R.C.2929.14(E)(4) violated the Sixth Amendment to the United States Constitution, because the findings in support of the consecutive sentences were neither admitted by him nor found by a jury. Although not expressly stated, Howard challenges the constitutionality of that portion of Ohio's sentencing scheme.
 {¶ 153} Howard did not raise this issue at anytime in the trial court below. Consequently, any error in that regard has been waived, and the issue has not been preserved for appellate review. See State v. Watkins,
Champaign App. No. 04CA12, 2005-Ohio-1378, ¶ 29-30 (declining to addressBlakely arguments which were raised for the first time on appeal); Statev. Austin, Montgomery App. No. 20445, 2005-Ohio-1035 (same).
 {¶ 154} In sum, we do not find that the trial court's conclusions were unsupported and contrary to the law. Moreover, we find that the court made all of the findings required by R.C. 2929.14(E)(4)(c) for the imposition of consecutive sentences.
 {¶ 155} The ninth assignment of error is overruled.
 {¶ 156} The judgment of the trial court will be affirmed.
Brogan, P.J. and Donovan, J., concur.
[1] Sentence in brackets () to be used only if appropriate. Instructions to be inserted or modified as appropriate to the proof and contentions.