OPINION
{¶ 1} Defendant-appellant Leonard Howard appeals from his convictions and sentence for two counts of Aggravated Robbery (deadly weapon), two counts of Aggravated Robbery (serious harm), two counts of Felonious Assault (deadly weapon), two counts of Felonious Assault (serious harm), one count of Receiving Stolen Property, one count of Burglary (habitation), one count of Aggravated Burglary (deadly weapon), and one count of Aggravated Burglary (physical harm), following a jury trial. Howard contends that the trial court erred in failing to make the findings necessary to order that some of his sentences be served consecutively, for a total of thirty years' imprisonment. We conclude that the trial court did make the appropriate findings and stated its reasons on the record to support its imposition of consecutive sentences.
 {¶ 2} Howard also contends that his sentence is illegal pursuant toBlakely v. Washington (2004), 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403, because his sentence was based on findings made by the trial court rather than by a jury. Because Howard failed to raise this issue in the trial court, any error in this regard has been waived and the issue has not been preserved for appellate review.
 {¶ 3} Howard also contends that he was denied effective assistance of counsel when defense counsel failed to object to prosecutorial improprieties and failed to request a mistrial on the basis of a witness's testimony. After analyzing all of Howard's contentions, we conclude that Howard was not denied effective assistance of counsel for the reasons stated below.
 {¶ 4} Howard contends that the trial court abused its discretion in failing to disqualify a juror who was acquainted with one of the State's witnesses. We conclude that the trial court did not abuse its discretion in failing to disqualify the juror. The acquaintanceship with the witness was neither recent nor close, and the juror ultimately stated that she was convinced that she could remain fair and impartial.
 {¶ 5} Howard contends that his conviction for Aggravated Robbery against one of the victims, Beatrice Miller, is against the manifest weight of the evidence and based upon insufficient evidence, because there is no evidence that he committed a theft offense against her. Pursuant to R.C. 2911.01(A)(1)(3), a person need only attempt to commit a theft offense while brandishing a deadly weapon and inflicting serious physical harm upon another to be guilty of Aggravated Robbery. Based on the evidence, we conclude that a jury could reasonably find that Howard attempted to commit a theft offense against Beatrice. We conclude that the State presented sufficient evidence to establish that Howard attempted to commit a theft offense against Beatrice while brandishing a deadly weapon and inflicting serious physical harm upon her and that each element of Aggravated Robbery was established. We also conclude that the jury's decision to convict Howard of committing Aggravated Robbery against Beatrice Miller is not against the manifest weight of the evidence.
 {¶ 6} Accordingly, the judgment of the trial court is Affirmed.
 "I {¶ 7} The State presented evidence tending to show that on December 6, 2003, Leonard Howard and five other people, Charles Vititoe, Christopher Pressley, Kelley Marcum, Stephen Black, and Tancy Johnson, participated in two "home invasions" in Riverside. The first home invasion was at the home of Gladys Sopczak. The group of six followed Sopczak home from a Chinese restaurant where she had stopped to pick up dinner for herself and her husband. When Sopczak, who was 71 years old, arrived home, she opened her garage door, pulled in, and got out of her vehicle to walk to the passenger side to remove her cane, purse, and food. At that moment, Howard, Vititoe, and Pressley approached Sopczak in her garage, and Vititoe hit her in the head with a gun knocking her glasses off. Sopczak elbowed Vititoe in the stomach, and he fell back into a lawnmower. Howard, Vititoe, and Pressley ran off, and Sopczak went in to get help from her husband. The Sopczaks called the police.
 {¶ 8} After leaving Sopczak's home, the group of six spotted Bernice and Warren Miller, an elderly couple, leaving Burger King and decided to follow them home. The Millers decided to stop to visit their ill friend, Verda Ping. Shortly after entering Ping's home, there was a knock on the door. When Warren answered the door, Vititoe was at the door and asked Warren if "the Jeffersons lived there?" Bernice told Warren to shut the door, but Howard rushed in with a gun and hit Warren in the head two to three times. He then struck Bernice in the head. Vititoe took two jewelry boxes from Ping's bedroom, and Howard took a wallet and a set of keys out of Warren's pants pocket. They took off when Bernice told them that Warren was having a heart attack. Bernice then called the police. Bernice and Warren both required stitches for their wounds. Bernice later identified Howard in a photo spread as the person who struck her.
 {¶ 9} After dividing up the stolen property from the second home invasion, the group of six decided to go to Meijer to make purchases with the Millers' credit card. They made several purchases at Meijer, including gas, clothing, and electronics. When Howard returned home, his girlfriend, mother, and mother's boyfriend, Carl Farley, were there. Howard informed them of the home invasions he participated in and of the shopping spree. Farley decided to turn Howard in and made an anonymous phone call to the Riverside Police Department.
 {¶ 10} The Millers later discovered the unauthorized transactions on their credit card and reported them to the police. Detective Kolby Watson contacted the store detective at Meijer, who had observed the shopping spree when it occurred and had followed the group of six out to their car to get their license plate number. The store detective gave Detective Watson a videotape from the store surveillance cameras showing the group making the transactions. Detective Watson determined through the license plate number that the vehicle was registered to Tancy Johnson. Johnson and Black were stopped and brought in to the police station. After Johnson confirmed who was involved, a search warrant was issued and executed at Howard's residence, where Meijer receipts, bags, clothing, and electronics were found matching the description of the purchases made on the Millers' credit card.
 {¶ 11} Howard was subsequently arrested and charged with two counts of Aggravated Robbery (deadly weapon), two counts of Aggravated Robbery (serious harm), two counts of Felonious Assault (deadly weapon), two counts of Felonious Assault (serious harm), one count of Receiving Stolen Property, one count of Burglary (habitation), one count of Aggravated Burglary (deadly weapon), and one count of Aggravated Burglary (physical harm). After a jury trial, Howard was found guilty of all counts. Howard was sentenced to a thirty-year prison term. From his conviction and sentence, Howard appeals.
 II {¶ 12} Howard's First Assignment of Error is as follows:
 {¶ 13} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY ENTERING A SENTENCE THAT IS PATENTLY ILLEGAL AND, IN ADDITION, AN ABUSE OF DISCRETION."
 {¶ 14} Howard contends that the trial court erred in failing to make the findings necessary to order his sentences to be served consecutively. Howard also contends that his sentence is illegal pursuant to Blakely v. Washington (2004), 542 U.S. 296, 124 S.Ct. 2531,159 L.Ed.2d 403, because his sentence was based on findings made by the trial court rather than by a jury. Howard further contends that the trial court abused its discretion in concluding that the shortest term of imprisonment would demean the seriousness of the offenses and would not adequately protect the public.
 {¶ 15} We first note that pursuant to R.C. 2953.08(G)(2), our standard of review on appeal is not whether the sentencing court abused its discretion. State v. Lofton, Montgomery App. No. 19852, 2004-Ohio-169, at ¶ 11. We may increase, reduce, or otherwise modify a sentence that is appealed or vacate the sentence and remand the matter for resentencing, only if we clearly and convincingly find that the record does not support the sentencing court's findings under the relevant statute. R.C.2953.08(G)(2)(a).
 {¶ 16} In this case, the relevant statute is R.C. 2929.14(E)(4). When a trial court requires that multiple sentences be served consecutively, it must comply with the terms of R.C. 2929.14(E)(4), which provides that "[i]f multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 {¶ 17} "(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 {¶ 18} "(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
 {¶ 19} "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."
 {¶ 20} "The court is permitted by R.C. 2929.14(E)(4) to order consecutive sentences only after certain findings are made. By requiring the court to then state the reasons for those findings, R.C.2929.19(B)(2)(c) obliges the court to not only have reasons but also to state what those reasons are. Further, in stating its reasons the court must connect those reasons to the finding which the reason supports. The court cannot merely pronounce causes that objectively may be its reasons. The court must also identify which of those causes are the particular reasons for each of the statutory findings the court made."State v. Rothgeb, Champaign App. No. 02CA7, 2003-Ohio-465, at ¶ 25.
 {¶ 21} In this case, the trial court ordered some of the sentences to run consecutively, for a total of thirty years' incarceration. In support of the imposition of consecutive sentences, the trial court stated:
 {¶ 22} "Mr. Howard, as I said, I've reviewed the evidentiary matters in this case. You were convicted by a jury of twelve, of twelve counts. I note for the record that I have considered everything in the presentence investigation. I've considered the memorandum of the State of Ohio. I've considered your attorney's input.
 {¶ 23} "I will note for the record first of all, sir, that all the victims of these offenses were elderly, ages 79 and 80. They [sic] are two separate home invasions. They were particularly brutal. Two victims were struck in the head with the butt of a gun and required stitches. You have a long history of juvenile delinquency. Amidst those adjudications are other offenses of violence and felony offenses. You have previously been convicted of a felony, an aggravated assault. Judge Barbara Gorman sentenced you to 18 months, and you were out just two months before these offenses occurred. You also have an adult misdemeanor conviction of assault.
 {¶ 24} "I find for the record that the shortest term of imprisonment would demean the seriousness of these offenses. I find further for the record that the shortest term would not adequately protect the public. I further find that you possess a great and serious likelihood of recidivism and that you committed particularly horrific forms of these offenses. You show no genuine remorse. You accept no responsibility for the crimes you have committed."
 {¶ 25} Although the trial court did not use the exact language of the statute, it did make the appropriate findings and stated its reasons on the record to support its imposition of consecutive sentences. The trial court found that consecutive sentences were necessary to protect the public and that the imposition of the consecutive sentences was not disproportionate to the seriousness of the Howard's conduct based on the "particularly horrific forms of these offenses" against elderly people, two of which were struck in the head with a gun and required stitches from "brutal" home invasions. The trial court also found that the imposition of the consecutive sentences was not disproportionate to the danger Howard posed to the public and that Howard's criminal history was so significant as to warrant the imposition of consecutive sentences in order to protect the public based on Howard's long history of juvenile delinquencies, his history of violent offenses and felony offenses, and the fact that he committed these offenses two months after being released from serving time for the felony offense of Aggravated Assault. The trial court also found Howard's lack of genuine remorse and failure to accept responsibility significant. We conclude that the trial court did not err in failing to make the findings necessary to order Howard's sentences to be served consecutively.
 {¶ 26} Regarding Howard's Blakely claim, we have previously declined to address Blakely arguments for the first time on appeal. See State v.Howard, Clark App. No. 2004CA29, 2005-Ohio-2237, at ¶ 153; State v.Watkins, Champaign App. No. 04CA12, 2005-Ohio-1378, at ¶ 30; State v.Austin, Montgomery App. No. 20445, 2005-Ohio-1035, at ¶ 22. Because Howard failed to raise this issue in the trial court, any error in this regard has been waived and the issue has not been preserved for appellate review. See id.
 {¶ 27} Howard also contends that the trial court erred in finding that the shortest term of imprisonment would demean the seriousness of the offenses and would not adequately protect the public. Howard argues that the trial court's finding is unsubstantiated because his criminal record is not lengthy.
 {¶ 28} R.C. 2929.14(B)(2) provides that, "if the court imposing a sentence upon an offender for a felony elects or is required to impose a prison term on the offender, the court shall impose the shortest prison term authorized for the offense pursuant to division (A) of this section, unless * * * [t]he court finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others."
 {¶ 29} The trial court concluded that the shortest term of imprisonment would demean the seriousness of Howard's offenses and would not adequately protect the public based on Howard's criminal record and the nature of his offenses. Howard's criminal record includes a history of juvenile delinquencies and a history of violent offenses and felony offenses as well as the felony offense of Aggravated Assault, for which he had just finished serving incarceration two months before these offenses. We conclude that the record supports the trial court's findings.
 {¶ 30} Howard's First Assignment of Error is overruled.
 III {¶ 31} Howard's Second Assignment of Error is as follows:
 {¶ 32} "APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL ATTORNEY FAILED TO OBJECT TO PROSECUTORIAL IMPROPRIETIES AS WELL AS FAILED TO ASSERT OTHER RIGHTS OF APPELLANT."
 {¶ 33} We evaluate claims of ineffective assistance of counsel under the two-part test provided in Strickland v. Washington (1984),466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. "In order to prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's representation fell below an objective standard of reasonableness and that, but for counsel's errors, the result of the proceeding would have been different." State v. Stevens, Montgomery App. No. 19572, 2003-Ohio-6249, at ¶ 33, citing Strickland, supra; State v.Bradley (1989), 42 Ohio St.3d 136, 142, 538 N.E.2d 373.
 {¶ 34} Defense counsel's failure to object waives all but plain error. State v. Ballew, 76 Ohio St.3d 244, 251, 1996-Ohio-81,667 N.E.2d 369. Counsel's failure to object "`constitutes a waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have been otherwise.'" Id.
 {¶ 35} Howard contends that he was denied effective assistance of counsel when his defense counsel failed to object to improper comments made by the prosecutor during closing arguments including calling Howard a "coward," referring to defense counsel's arguments as "rubbish," and asking the jury not to give Howard a "freebie."
 {¶ 36} In analyzing claims of prosecutorial misconduct, "we must first determine whether the prosecutor's remarks were improper; if so, we then consider whether the remarks prejudicially affected substantial rights of the accused. We evaluate the allegedly improper statements in the context of the entire trial. An improper comment does not affect a substantial right of the accused if it is clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments." State v. Treesh, 90 Ohio St.3d 460, 464, 2001-Ohio-4,739 N.E.2d 749, internal citations omitted.
 {¶ 37} "Generally, prosecutors are entitled to considerable latitude in opening statement and closing argument. In closing argument, a prosecutor may comment freely on `what the evidence has shown and what reasonable inferences may be drawn therefrom.' `Moreover, because isolated instances of prosecutorial misconduct are harmless, the closing argument must be viewed in its entirety to determine whether the defendant has been prejudiced.'" State v. Carr-Poindexter, Montgomery App. No. 20197, 2005-Ohio-1571, at ¶ 63, internal citations omitted.
 {¶ 38} In closing argument, the prosecutor argued that Stephen Black and Christopher Pressley "stood up like men and told you what happened. Not like some coward who would assault an 80-year-old woman and a 78-year-old man." In rebuttal to defense counsel's closing argument, the prosecutor also stated the following:
 {¶ 39} "Now, Mr. Zugelder makes mention and note of the identification by Mrs. Miller. You know when you have a significant, startling event that happens to you, where you see your husband bludgeoned by a gun, and him approaching you, whatever time it takes, I submit to you that that's frozen in her memory. * * * Out of 30 white males in photo spreads; who does he pick out? Who does she pick out instantly? Him, Howard. Honestly mistaken, rubbish."
 {¶ 40} The prosecutor ended his closing argument asking the jury, "Please do not give him a freebie for any reason."
 {¶ 41} After reviewing the entirety of the prosecutor's closing argument, we find that even if the prosecutor's statements were improper, they were isolated instances and harmless. Therefore, we conclude that Howard was not prejudiced by the prosecutor's statements. We also conclude that Howard was not denied effective assistance of counsel. "[D]eclining to object to a closing argument is often a reasonable tactical choice." State v. Williams, 99 Ohio St.3d 493,2003-Ohio-4396, 794 N.E.2d 27, at ¶ 159. We find that it is a reasonable tactical choice not to object to improper statements by the prosecutor that were isolated instances. We also conclude that there is no reasonable probability of a different outcome in this case, if Howard's defense counsel had objected to the prosecutor's improper comments.
 {¶ 42} Howard contends that he was denied effective assistance of counsel because his defense counsel failed to move for a mistrial when a State's witness testified that he met Howard "when they went to prison over a felonious assault."
 {¶ 43} We have previously stated that "[e]vidence of a defendant's prior bad act is not admissible to show that the defendant has a disposition or propensity toward the commission of a crime. A trial court may not admit evidence that tends to show that the defendant committed a crime entirely independent of the offense for which he is on trial. However, a curative instruction is an appropriate remedy, rather than a mistrial, for inadvertent answers given by a witness to an otherwise innocent question. Further, a jury is presumed to follow curative instructions given by the trial court and therefore a trial court sustaining an objection and giving a curative instruction has been held to be enough to cure the taint from an improper statement." State v.Mobley, Montgomery App. No. 18878, 2002-Ohio-1792, 2002 WL 506626, at *2.
 {¶ 44} When the prosecutor in this case asked its witness Christopher Pressley how long he had known Howard prior to December 6, 2003, Pressley responded, "Not very long. I've known him approximately a year and a half and he — before — first time I met him, he was — when we went to prison over a felonious assault." Defense counsel objected and asked that Pressley's answer be stricken. The trial court sustained his objection stating that "[t]he latter part of his testimony is stricken and the jury is cautioned to disregard it."
 {¶ 45} Pressley's statement was an inadvertent response given to the prosecutor's unprompted, innocent question regarding how long he had known Howard. Therefore, the trial court's curative instruction was an appropriate remedy, rather than a mistrial. We conclude that Howard was not denied effective assistance of counsel when defense counsel did not move for a mistrial.
 {¶ 46} Howard contends that he was denied effective assistance of counsel when defense counsel failed to object to the prosecutor's question posed to Carl Farley asking him, "You swear on that?" The question was asked after Farley testified that he was certain that what he testified to actually happened in his presence. Howard contends that the prosecutor placed undue emphasis and weight on Carl Farley's testimony by asking the question. We conclude that the prosecutor did not give Farley more credibility by asking him to swear on his answer, especially when swearing to one's testimony is required even before a witness gives their testimony. We conclude that Howard was not denied effective assistance of counsel when defense counsel failed to object to the prosecutor's question.
 {¶ 47} Howard contends that he was denied effective assistance of counsel when his defense counsel failed to object to leading questions by the prosecutor. Howard points out several examples of prosecutorial leading questions during the trial.
 {¶ 48} We have previously said that "the failure to object to leading questions will almost never rise to the level of ineffective assistance of trial counsel. There is no reason to object to leading questions that are intended to elicit routine or undisputed facts. These facts are clearly going to be established in any event, and leading questions may simply expedite the proceedings. Even if the testimony elicited involves disputed or controversial facts, experienced trial counsel may reasonably decide not to object. The effect of leading questions on the responses elicited is something familiar to most jurors; it is within the ken of everyday experience. Many lay jurors will understand, intuitively, at least, that testimony elicited without the aid of leading questioning is more impressive, and trial counsel may reasonably conclude that forcing opposing counsel to ask non-leading questions will just make a witness's adverse testimony more impressive to the jury, and hence more damaging."State v. Jones, Montgomery App. No. 20349, 2005-Ohio-1208, at ¶ 28.
 {¶ 49} Most of the questions that Howard alleges to have been leading, either were not leading, were used to summarize previous testimony, were used to clarify witness responses, or were used to direct a witness's attention to the topic of inquiry. For example, when the prosecutor asked Christopher Pressley the question, "It wasn't 9 o'clock in the evening, was it," it was to summarize previous testimony given by Pressley. Prior to asking the question, the prosecutor had asked Pressley, "About what time in the afternoon was that," and Pressley responded that "it was approximately around 9 — 9:30 when we left." In addition, defense counsel did object to the prosecutor's question as asked and answered, and the objection was overruled.
 {¶ 50} When the prosecutor asked Pressley, "His name was Black, right," this served to clarify Pressley's response to his previous question when Pressley stated, "We leave with Hollywood." Previous testimony established that "Hollywood" was Black's nickname, and the prosecutor appeared to be clarifying Pressley's use of the "Hollywood" nickname for Black in his testimony.
 {¶ 51} At another point in the trial, the prosecutor asked Gladys Sopczak, "You could tell it was a male, though, right?" However, it was after she had referred to her attacker as a "he" several times.
 {¶ 52} Howard contends that the prosecutor "testified for" Bruce Christian, the Meijer store detective, regarding the electronic records of Howard's purchases. A review of the page in the transcript to which Howard refers shows that the prosecutor was directing Christian's attention to the topic of inquiry — Exhibit 47, the electronic home journal report. The prosecutor then proceeded to ask Christian what it showed. We do not find these questions to be leading.
 {¶ 53} When the prosecutor asked Black, "And we're talking about what happened before the two home invasions, right," the prosecutor was clarifying the timeline of the events that were being discussed at that point in the questioning. Howard also contends that the prosecutor asked twenty leading questions on redirect that suggested Black was not testifying to get a better deal on his sentencing. A review of the record shows that several of these questions were not leading. If the remaining questions were leading, the prosecutor, upon objection, could simply have rephrased these questions, which may have elicited the same response, thereby drawing further attention to the testimony.
 {¶ 54} Even if Howard's defense counsel had objected to these allegedly leading questions, we conclude that there is no reasonable probability of a different outcome in this case. We conclude that Howard was not denied effective assistance of counsel when his defense counsel failed to object to leading questions by the prosecutor.
 {¶ 55} Howard's Second Assignment of Error is overruled.
 IV {¶ 56} Howard's Third Assignment of Error is as follows:
 {¶ 57} "THE TRIAL COURT ABUSED ITS DISCRETION IN REFUSING TO REMOVE A JUROR WHO HAD AN ARTICULATED BIAS TOWARD COMPLAINANT."
 {¶ 58} Howard contends that the trial court abused its discretion in failing to disqualify Juror Anna Weitzman, because she had demonstrated a bias toward him.
 {¶ 59} "The decision whether or not to disqualify a juror is a discretionary function and as such will not be reversed absent an abuse of discretion." State v. Davis, Montgomery App. No. 20135, 2005-Ohio-121, at ¶ 21. A trial court abuses its discretion when it makes a decision that is unreasonable, arbitrary, or unconscionable. State v. Adams
(1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144.
 {¶ 60} A juror in a criminal case may be challenged for cause if he or she demonstrates bias toward the defendant. R.C. 2945.25(B). However, "no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from examination of the juror or from other evidence, that he will render an impartial verdict according to the law and the evidence submitted to the jury at the trial[.]" Id. "[T]he fact that a juror is acquainted with a witness would not necessarily affect the juror's impartiality." State v. Woodards (1966),6 Ohio St.2d 14, 22, 35 O.O.2d 8, 215 N.E.2d 568.
 {¶ 61} After Gladys Sopczak testified, Juror Anna Weizman indicated to the bailiff that she knew Sopczak. In an in-chambers conference, the trial judge examined Weizman and allowed the defense counsel and the prosecutor to examine her as well. Weizman stated that she knew Sopczak because Sopczak was a member of her church and Sopczak worked with her son's mother-in-law. Weizman stated that she was with her two to three times at her son's mother-in-law's home. When examined by the trial judge, Weizman then stated as follows:
 {¶ 62} "THE COURT: I see. Now, the question, of course, having that knowledge of her, would that interfere with your independent evaluation of her testimony?
 {¶ 63} "ANNA WEIZMAN: I believe it would.
 {¶ 64} "THE COURT: In what way might it?
 {¶ 65} "ANNA WEIZMAN: Well, she's a nice honest lady; and I would hate for anything to happen to her and I know what did happen to her, according to her."
 {¶ 66} The prosecutor then examined Weizman as follows:
 {¶ 67} "MR. POHLMAN: Weizman, I'm sorry. Mrs. Weizman, in consideration of your acquaintanceship, or the fact that you know who she is and have had conversations with her, would you be able to set that aside and evaluate her testimony as to its credibility as you would any other witness?
 {¶ 68} "ANNA WEIZMAN: Yes.
 {¶ 69} "MR. POHLMAN: You could do that?
 {¶ 70} "ANNA WEIZMAN: Uh-huh.
 {¶ 71} "MR. POHLMAN: Would you — would you give her — would you be able to set aside your acquaintanceship so that you could be objective in terms of evaluating her testimony?
 {¶ 72} "ANNA WEIZMAN: I don't think I could, honestly.
 {¶ 73} "MR. POHLMAN: Do you think that that [sic] you could fairly consider her testimony in light of other witness' testimony in terms of your evaluation of all the testimony in the case?
 {¶ 74} "ANNA WEIZMAN: Overall, yes.
 {¶ 75} "MR. POHLMAN: You could do that?
 {¶ 76} "ANNA WEIZMAN: Uh-huh.
 {¶ 77} "MR. POHLMAN: Overall, even though you have an acquaintanceship or know who she is and talk to her on occasion, would you be able to be a fair and impartial juror here for both the State of Ohio and the defendant in this case?
 {¶ 78} "ANNA WEIZMAN: I will try my best.
 {¶ 79} "MR. POHLMAN: Do you think that you could do that?
 {¶ 80} "ANNA WEIZMAN: Yes."
 {¶ 81} When defense counsel examined Weizman, she stated the following:
 {¶ 82} "MR. ZUGELDER: Mrs. Weizman, do you think it would be difficult for you to be impartial with respect to the testimony given by Mrs. Sopczak?
 {¶ 83} "ANNA WEIZMAN: No.
 {¶ 84} "MR. ZUGELDER: Do you feel that your acquaintanceship with her causes you to believe her more than anyone else?
 {¶ 85} "ANNA WEIZMAN: No, I really don't know her that well. I just wanted you to know that I'm acquainted with her.
 {¶ 86} "* * *
 {¶ 87} "MR. ZUGELDER: Does it cause you some discomfort watching her testimony?
 {¶ 88} "ANNA WEIZMAN: No.
 {¶ 89} "MR. ZUGELDER: Would you prefer — if you had your choice, would you rather not be on a jury where you have to sit in judgment of someone who's accused of committing a crime against them?
 {¶ 90} "ANNA WEIZMAN: No."
 {¶ 91} The trial judge then examined Weizman again and she clarified her association with Sopczak at the church. Weizman stated that she merely knew Sopczak was a member of the church, and that she never did any formal work with Sopczak on committees. Weizman stated that it was five years ago that she knew Sopczak from church. She stated that she had been in her presence only once in the last five years at her son's mother-in-law's residence. Weizman stated that the acquaintanceship was not a recent one and that she was not even aware of this altercation.
 {¶ 92} "THE COURT: I see. So, I guess the question is, as we've asked a couple different times, can you evaluate her testimony along with the others, and be impartial in the way that you approach deciding this case?
 {¶ 93} "ANNA WEIZMAN: I think so.
 {¶ 94} "THE COURT: Anything further, Mr. Zugelder?
 {¶ 95} "MR. ZUGELDER: When you say you think so, that indicated there may be some doubt. Is there some doubt in your mind?
 {¶ 96} "ANNA WEIZMAN: Not really.
 {¶ 97} "MR. ZUGELDER: So, you're convinced that —
 {¶ 98} "ANNA WEIZMAN: Uh-huh.
 {¶ 99} "MR. ZUGELDER: — that you can remain fair and impartial on both sides despite your past relationships with Mrs. Sopczak?
 {¶ 100} "ANNA WEIZMAN: Yes."
 {¶ 101} The trial court then ruled that Weizman would not be excused from the jury, finding that Weizman could impartially consider all of the evidence and render an impartial verdict.
 {¶ 102} Although Juror Weizman was inconsistent at times in her responses, we cannot conclude that the trial court abused its discretion in failing to disqualify her. Weizman's acquaintanceship with Sopczak was neither recent nor close. Weizman stated that it had been five years since she knew Sopczak as a member of her church and had only seen her once in the last five years at her son's mother-in-law's residence. She also stated that she did not know her very well. Weizman stated that she only knew of Sopczak as a member of her church and had only seen her a few times at her son's mother-in-law's residence. Although Weizman appeared somewhat hesitant at first, she ultimately stated that she was convinced that she could remain fair and impartial.
 {¶ 103} We conclude that the trial court did not abuse its discretion in failing to disqualify Juror Weitzman. Accordingly, Howard's Third Assignment of Error is overruled.
 V {¶ 104} Howard's Fourth Assignment of Error is as follows:
 {¶ 105} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN ENTERING A FINDING OF GUILTY TO THE CHARGE OF AGGRAVATED ROBBERY AGAINST COMPLAINANT BEA MILLER WHICH FINDING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[.]"
 {¶ 106} Howard contends that his conviction for Aggravated Robbery against Beatrice Miller is against the manifest weight of the evidence and based upon insufficient evidence, because there is no evidence that he committed a theft against Beatrice Miller.
 {¶ 107} "A sufficiency of the evidence argument challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law. State v. Thompkins, 78 Ohio St.3d 380, 1997-Ohio-52. The proper test to apply to such an inquiry is the one set forth in paragraph two of the syllabus of State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492:
 {¶ 108} "`An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'
 {¶ 109} "In reviewing a judgment to determine whether it is against the manifest weight of the evidence, an appellate court sits as a `thirteenth juror,' reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v.Thompkins (1997), 78 Ohio St.3d 380, 678 N.E.2d 541." State v. Reed,
Champaign App. No. 2002-CA-30, 2003-Ohio-5413, at ¶¶ 12-14.
 {¶ 110} Howard was convicted of committing two counts of Aggravated Robbery against Beatrice Miller. R.C. 2911.01(A)(1)(3), Aggravated Robbery, provides that "[n]o person, in attempting or committing a theft offense * * * shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it * * * [or] [i]nflict, or attempt to inflict, serious physical harm on another."
 {¶ 111} We find that there is some evidence in the record to establish that Howard did commit a theft offense against Beatrice Miller. Howard's co-conspirator, Christopher Pressley, testified that right before they left the house that night, Howard "grabbed the purse." In Stephen Black's testimony, he also mentioned going back to his girlfriend's apartment with the group and going through the jewelry, purse, and wallet. Officer Robert Naff of the Riverside Police Department testified that when he arrived at the scene of the crime, Beatrice informed him that her purse was taken. Beatrice testified that her credit card was stolen that night. She testified that her credit card company contacted her and she discovered unauthorized purchases on her credit card. However, Beatrice did not mention that her purse was stolen when she testified, and the purse was not mentioned at any other point during the trial.
 {¶ 112} We conclude that even if Howard did not commit a theft offense against Beatrice, the evidence shows that he did attempt to commit a theft offense against Beatrice. Howard's co-conspirators, Stephen Black and Christopher Pressley, both testified that Howard wanted to rob someone and make money that night. Pressley testified that they followed the Millers, because they thought they would have cash since they were leaving Burger King. Black testified that they followed the Millers from Burger King to rob them.
 {¶ 113} Based on the foregoing testimony, we conclude that the jury could reasonably find that Howard attempted to commit a theft offense against Beatrice. We conclude that the State presented evidence sufficient to establish that Howard attempted to commit a theft offense against Beatrice while brandishing a deadly weapon and inflicting serious physical harm upon her and that each element of Aggravated Robbery was established. We further conclude that the jury's decision to convict Howard of committing two counts of Aggravated Robbery against Beatrice Miller is not against the manifest weight of the evidence.
 {¶ 114} Howard's Fourth Assignment of Error is overruled.
 VI {¶ 115} All of Howard's assignments of error having been overruled, the judgment of the trial court is Affirmed.
Brogan, P.J., and Wolff, JJ., concur.