OPINION
 "I {¶ 1} Defendant-Appellant Walter Evans appeals his conviction for two counts of murder, one count of gross abuse of a corpse, and one count of tampering with evidence.
 {¶ 2} On May 1, 2003 Montgomery County deputies were dispatched to a garbage dumpster on a report of a corpse found in the dumpster. There deputies found the body of an African-American woman who was nude from the waist down, except for a sock on one foot. She also wore a t-shirt and bra, both of which were pulled up over her breasts. Her legs were burnt, as were the couch cushions found covering her torso. The dumpster smelled of gasoline.
 {¶ 3} The deputies arranged to have the dumpster brought to the crime lab where it was searched. They found a pair of blue pants, a sock matching the one on the body, a pair of panties, and a partially burnt scarf that one of the investigators recognized as being worn by McDonald's employees. The investigator informed the case detectives, who began contacting local McDonald's restaurants to see if any employees had failed to report for work. They learned that Ursula Coppess had failed to report to work at the Trotwood McDonald's on April 29, 2003. Coppess' supervisor provided police with Coppess' address and emergency contact information.
 {¶ 4} The detectives went to Coppess' apartment where management confirmed that Coppess lived at that address and that her sister was Tawana Senter. The detectives called Tawana, who met them at the apartment. Tawana identified her sister from a photograph of the body found in the dumpster. Tawana also recognized the clothing as what Coppess was wearing when Tawana saw her earlier in the day on April 28th.
 {¶ 5} The detectives entered the apartment, but found no other victims. They noticed that the couch was missing its cushions and that the couch pattern matched the burnt cushions found with Coppess' body in the dumpster. The detectives obtained a warrant to search the rest of the apartment. They found a Blockbuster receipt for several movies rented on April 28th.
 {¶ 6} The following day Coppess' sisters, Tawana and Monica Senter, advised the detectives that Coppess had told them that Evans was supposed to come over after work on April 28th. Ray Senter, Tawana's half-brother and Evans' cousin told police that Evans admitted to him that he watched videos with Coppess early on the morning of April 29th. Senter also told police where he thought that Evans lived, that he worked as a security guard, and that he drove both a gray Pontiac Grand Am and a tan Audi. The detectives verified Evans' address with LEADS, which also revealed that Evans had received a ticket in a Grand Am registered to Chempkemboi Nelson, who Senter identified as Evans' girlfriend. When police drove by the address, they saw both Nelson's gray Grand Am and the tan Audi, registered to Evans.
 {¶ 7} Due to the undressed state of the victim, police believed the death to be sexually related. When they ran a check of Evans' criminal history, they found that he was previously convicted of sexual battery. The detectives learned that Evans was on probation, so they contacted his probation officer, Michael Hurt. On April 29th Hurt saw Evans with burns on his hands and face. Evans told Hurt that when he tried to light a drum full of gas, it ignited and burned him. Hurt also told the detectives that Evans worked for Peake Security.
 {¶ 8} The detectives met with Evans' supervisor at Peake, Jeanette Ware. She told them that she saw Evans before his shift began on either April 29th or 30th, and that he had burns on his hands and face. Evans told Ware that he was playing cards outside and was putting oil into a heater to keep warm when the heater exploded. Ware told the detectives where Evans was assigned and what his work schedule was. She confirmed that Evans usually drove a gray Grand Am to work.
 {¶ 9} That night four detectives drove to Evans' work site, where they found Evans parked in a gray Grand Am at his assigned location. The detectives approached, introduced themselves and asked Evans to accompany them to the police station to discuss Coppess' death. Evans agreed. The detectives noticed that Evans' right hand and forearm were bandaged and that he had burns on his right ear and the right side of his bottom lip.
 {¶ 10} Before he was taken to the station by Detectives Ward and Hutchison, Evans gave his car keys to Detective Copher, who made arrangements for the car to be towed to the evidence garage. At the station, Detectives Ward and Hutchison interviewed Evans, who admitted being with Coppess on April 29th. Evans told them that he and Coppess drank Pepsi and Hennessey and watched videos, and then he left and went home. He explained that he burnt himself while trying to light the grill at home at 4:00 a.m.
 {¶ 11} During the course of the interview, Evans admitted that he strangled Coppess to death from behind with a scarf while the two were having sex. He told the detectives that when her body went limp after about five minutes, he panicked and rather than calling for help, he made three trips to his car carrying out Coppess' body, her clothing, and the couch cushions. Evans drove to a gas station and bought gas. He then went to a dumpster where he put Coppess' body, her clothing, and the cushions, poured in the gasoline, and lit the dumpster's contents on fire. When the gas ignited, it burned Evans. At the conclusion of the interview, the detectives placed Evans under arrest.
 {¶ 12} Later that day the detectives obtained a search warrant for Evans' Grand Am. In the glove box, they found a single-edged knife that appeared to have been singed on the end. They also found a Hennessey bottle in the trunk.
 {¶ 13} In addition to the stories that Evans told Hurt, Ware, and the detectives, Evans gave several other accounts of his activities with Coppess and of the cause of his burns. On April 29th when Nelson found Evans running cold water over his blistered hand, he told her that he burned his hand when trying to light a trash can at work to keep warm. Later in the day he told the doctor who treated him at Miami Valley Hospital that he worked with barrels of gas, and he was burned when he lit one that was nearly empty in order to burn out the remaining gas.
 {¶ 14} On May 2nd, after hearing a news report of the discovery of Coppess' body, Evans told Nelson a different story. Evans told Nelson that he was with his cousin on the night of the murder and that two strange men had stabbed Coppess and forced him to burn her body. Evans and Nelson decided to tell people that Evans burned himself trying to light the grill at home, which was the story that they both initially told the police.
 {¶ 15} After his arrest, Evans told his cousin, Tommy Owens, Jr., the same story that he had told the police; that he and Coppess were having sex and that he strangled her to death with a scarf, then panicked and burned her body. When Owens asked Evans why he did not call the police, Evans had no response.
 {¶ 16} An autopsy showed that Coppess was stabbed in the abdomen with a single-edged knife, consistent with the one found in the glove box of Evans' Grand Am. Coppess also sustained at least four blows to the head with a blunt object. Additionally, due to the muscular bruising on Coppess' neck and the broken capillaries found on her face and neck, the coroner determined that she died from manual, rather than ligature strangulation.
 {¶ 17} A grand jury indicted Evans on two counts of murder, one count of gross abuse of a corpse, and one count of tampering with evidence. Evans filed a motion to suppress, which the trial court overruled. A jury found Evans guilty of all charges, and the trial court sentenced him to fifteen years to life for murder, concurrent with one year for gross abuse of a corpse and consecutive to three years for tampering with evidence. Evans appeals from his convictions and sentence.
 II {¶ 18} Evans' first assignment of error:
 {¶ 19} "Appellant's trial counsel[`s] failure to provide reasonably effective assistance and essential duties unconstitutionally denied Appellant his right to counsel, a fair trial and due process as guaranteed by the Fifth, Sixth andFourteenth Amendments to the United States Constitution and Section[s] 10 and 16 of Article 1 of the Ohio Constitution."
 {¶ 20} In his first assignment of error, Evans presents four arguments in support of his claim that his trial counsel was ineffective. Evans alleges that trial counsel failed to adequately investigate and prepare for trial; that counsel failed to get spousal communication evidence excluded; that counsel failed to meaningfully challenge the State's expert witness regarding the victim's cause of death; and that counsel failed to file a motion to suppress Evans' confession. We disagree with all four claims.
 {¶ 21} In order to prevail on a claim of ineffective assistance of counsel, the defendant must show both deficient performance and resulting prejudice. Strickland v. Washington
(1984), 466 U.S. 668, 104 S.Ct. 2052. To show deficiency, the defendant must show that counsel's representation fell below an objective standard of reasonableness. Id. Trial counsel is entitled to a strong presumption that his conduct falls within the wide range of effective assistance. Id. The adequacy of counsel's performance must be viewed in light of all of the circumstances surrounding the trial court proceedings. Id. Hindsight may not be allowed to distort the assessment of what was reasonable in light of counsel's perspective at the time.State v. Cook (1992), 65 Ohio St.3d 516, 524, 605 N.E.2d 70.
 {¶ 22} Even assuming that counsel's performance was ineffective, the defendant must still show that the error had an effect on the judgment. State v. Bradley (1989),42 Ohio St.3d 136, 142, 538 N.E.2d 373. Reversal is warranted only where the defendant demonstrates that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Id.
 {¶ 23} Evans alleges that counsel failed to sufficiently investigate and prepare for trial because he failed to obtain a bill of particulars and because he failed to interview the State's witnesses prior to trial. Initially, we note that the record does not support Evans' claim that counsel did not interview the State's witnesses. Thus, Evans has failed to meet his obligation to show error by reference to matters in the record. Knapp v. Edwards (1980), 61 Ohio St.2d 197, 199,400 N.E.2d 384; App.R. 16(A)(3) and (7). The record does illustrate that counsel's cross-examination of the State's witnesses suggest that he was thoroughly familiar with the facts of the case and the accounts of events given by those witnesses. Moreover, counsel successfully sought to have an investigator appointed to find and interview witnesses on Evans' behalf.
 {¶ 24} Additionally, while it is true that counsel did not request a bill of particulars, the record demonstrates that counsel did seek all available discovery under both Crim.R. 16 and under the broader discovery provisions of the local court management plan. When the State allows open-file discovery, as it did in this case, a bill of particulars is not required. Statev. Tebcherani (Nov. 22, 2000), Summit App. No. 19535, citations omitted.
 {¶ 25} Next, Evans argues that counsel was ineffective because he failed to seek exclusion of Chepkemoi Nelson's testimony under the spousal communication privilege. However, Evans ignores the fact that he was not married to Nelson when her statements were made; the two were merely engaged. Spousal privilege applies only to communications and acts during the marriage. R.C. § 2317.02(D).
 {¶ 26} Evans also insists that counsel was ineffective because he failed to thoroughly challenge the State's expert witness testimony regarding Coppess' cause of death. Specifically, Evans claims that counsel failed to put on expert testimony to rebut the coroner's conclusion that Coppess died of manual strangulation and that the killer's hands had been around her neck for three to five minutes. However, Evans fails to show that counsel did not seek such testimony. It is certainly possible that no such expert could be found. Thus, Evans fails to demonstrate that the absence of such testimony proves counsel's deliberate choice not to pursue a potentially fruitful line of defense.
 {¶ 27} Evans' final contention regarding his claim that counsel was ineffective is that counsel failed to file a motion to suppress Evans' confession. However, the record shows that a motion to suppress evidence, including the confession, was filed on August 11, 2003. The trial court held two hearings on the motion before overruling it on June 17, 2004. Therefore, the record refutes Evans' claim that counsel never filed a motion to suppress Evans' confession.
 {¶ 28} Because the record shows that counsel violated no essential duty to Evans, he was not denied the effective assistance of trial counsel, and his first assignment of error will be overruled.
 III {¶ 29} Evans' second assignment of error:
 {¶ 30} "The trial court committed prejudicial error when it overruled Defendant's motion to suppress. The State's conduct constituted a violation of the Appellant's rights against unlawful search and seizues (sic) as guaranteed by theFourth Amendment to the United States Constitution."
 {¶ 31} In his second assignment of error, Evans claims that the trial court erred in denying his motion to suppress evidence seized during a search of his car. Specifically, Evans insists that the police had no probable cause or exigent circumstances to justify the seizure of his Grand Am. When deciding a motion to suppress evidence, an appellate court is bound to accept the trial court's factual findings if they are supported by competent and credible evidence, and the appellate court must then independently determine as a matter of law if the minimum constitutional standard has been met. State v. Williams (1993),86 Ohio App.3d 37, 41, 619 N.E.2d 1141.
 {¶ 32} When Evans accompanied the detectives to the police station, his car was parked in an open parking lot; anyone with a key could have moved it at any time. When a vehicle is readily mobile, police may search it with nothing more than probable cause to believe that the vehicle contains evidence; no warrant is necessary. Pennsylvania v. Labron (1996), 518 U.S. 938,116 S.Ct. 2485, Carroll v. U.S. (1925), 267 U.S. 132, 45 S.Ct. 280. See, also, State v. Kessler (1978), 53 Ohio St.2d 204,373 N.E.2d 1252. {¶ 33} Here, the police did have probable cause to seize the vehicle. Probable cause exists when there is a "fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates (1983), 462 U.S. 213,238, 103 S.Ct. 2317.
 {¶ 34} As the trial court noted, when the police seized the car, they knew that Coppess' sisters had last seen her on April 28, 2003, that she worked until 11:00 or 11:30 that night, and that she had failed to show up for work the following day. The police also knew that Evans drove the car to work on April 28, 2003 and that Coppess told her sisters that Evans was coming to her house to watch videos that night. Someone rented videos on Coppess' Blockbuster account that night, and Evans told his cousin that he was watching videos with Coppess during the early morning hours on April 29, 2003. The police knew that Coppess' couch was missing its cushions and that burnt cushions matching the pattern of the couch were found in a dumpster with Coppess' body about 1.5 miles from her home. The officers had several statements that Evans had burns on his hands and face and that he had told conflicting stories about how he received the burns. Furthermore, the officers saw the burns when they met with Evans. The officers also knew that the dumpster smelled of gasoline.
 {¶ 35} The trial court found that given all of these facts, which were known to the officers at the time that the car was towed, the police had probable cause to seize the Grand Am and to search it. Nevertheless, the officers chose to wait to search the car until after a search warrant was obtained. We agree with the trial court that because Evans' car was readily mobile and because the police had probable cause to search the car, its seizure did not violate Evans' Fourth Amendment rights. Accordingly, the trial court did not err in overruling Evans' motion to suppress, and his second assignment of error will be overruled.
 IV {¶ 36} Evans' third assignment of error:
 {¶ 37} "Appellant's right to a jury determination of the factors decided by the trial judge to support the sentence imposed for tampering with evidence ordered to be served consecutive in excess of the minimum sentence unconstitutionally infringed Appellant's due process and trial rights as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Section[s] 10 and 16 of Article 1 of the Ohio Constitution."
 {¶ 38} Here Evans maintains that pursuant to Blakely v.Washington (2004), 542 U.S. 296, 124 S.Ct. 2531, and Apprendiv. New Jersey (2000), 530 U.S. 466, 120 S.Ct. 2348,147 L.Ed.2d 435, the trial court deprived him of his Sixth Amendment right to a jury trial when it sentenced him to more than the minimum sentence on the tampering with evidence charge and when it ran that sentence consecutively with the sentences ordered for the other two charges. The Supreme Court of Ohio recently held that parts of Ohio's felony sentencing scheme are unconstitutional.State v. Foster, ___ Ohio St.3d ___, 2006-Ohio-856. The unconstitutional provisions include R.C. § 2929.14(B), which addresses non-minimum sentences, and R.C. § 2929.14(E)(4), which concerns consecutive prison terms. In light of Foster we will reverse Evans' sentence and remand this case for re-sentencing.
 {¶ 39} Revised Code § 2929.14(B) states that a court must impose the minimum sentence for an offense unless (1) the offender was serving or had previously served a prison term, or (2) the court finds that the shortest term will demean the seriousness of the offense or will not adequately protect the public from future crime by the offender or others.
 {¶ 40} Revised Code § 2929.14(E)(4) states:
 {¶ 41} "If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 {¶ 42} "(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section2929.16 [residential sanctions], 2929.17 [non-residential sanctions], or 2929.18 [financial sanctions; restitution] of the Revised Code, or was under post-release control for a prior offense.
 {¶ 43} "(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
 {¶ 44} "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."
 {¶ 45} In addition, R.C. 2929.19(B)(2)(c) requires the court to state its reasons for imposing consecutive sentences. SeeState v. Rothgeb, Champaign App. No. 02CA7, 2003-Ohio-465, ¶ 25; State v. Howard, Montgomery App. No. 20575, 2005-Ohio-3702, ¶ 20.
 {¶ 46} Following the United States Supreme Court's decisions in Apprendi, supra, and Blakely, supra, the Supreme Court held in Foster that R.C. §§ 2929.14(B) and 2929.14(E)(4) are unconstitutional because they "require judicial factfinding before imposition of a sentence greater than the maximum term authorized by a jury verdict or admission of the defendant."Foster at ¶¶ 65-67, 83. The Court severed the provisions of the statute that it found to be unconstitutional, including these two sections. Id. at ¶¶ 97, 99. In light of this holding, trial courts now have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or to give their reasons for imposing non-minimum sentences on an offender who has never served a prison term. Id.;State v. Mathis, ___ Ohio St.3d ___, 2006-Ohio-855, ¶¶ 26, 37.
 {¶ 47} Because Foster held the statutes under which Evans' sentence was imposed to be unconstitutional and severed them from the sentencing provisions of the Revised Code, we must reverse Evans' sentence and remand this case for a new sentencing hearing. Foster, at ¶ 104-105. At the sentencing hearing, the trial court "shall consider those portions of the sentencing code that are unaffected by [Foster] and impose any sentence within the appropriate felony range. If the offender is sentenced to multiple prison terms, the court is not barred from requiring those terms to be served consecutively." Id. at ¶ 105. Additionally, we note that R.C. §§ 2929.11 and 2929.12, which set forth statutory "considerations" and do not require factfinding, were not affected by Foster. While Evans may argue for a reduction in his sentence and for concurrent sentences on remand, nothing prevents the trial court from imposing consecutive sentences with a lesser, the same, or a greater aggregate sentence. Id.
 {¶ 48} The third assignment of error will be sustained.
 V {¶ 49} Evans' fourth assignment of error:
 {¶ 50} "The trial court's failure to execute its `affirmative duty' to protect Appellant's trial rights violated Appellant's due process and trial rights in violation of the Sixth andFourteenth Amendments to the United States Constitution and Section[s] 10 and 16 of the Ohio Constitution."
 {¶ 51} Finally, Evans presents two cursory claims, without any specific citations to the record, that he was denied his right to a fair trial because the trial court failed to thoroughly inquire about his complaints regarding his trial counsel's representation of him and because the court made only a cursory inquiry when he complained that the jury was tainted because two jurors saw him being escorted down the hall by uniformed police officers during a lunch break. We disagree with both claims.
 {¶ 52} The record reveals that Evans first complained to the trial court about his trial counsel via two motions filed following the announcement of the jury verdicts. The State promptly filed a written response, and the court conducted an inquiry, at which time Evans never asked for a new attorney, and he agreed that he wanted to proceed to sentencing with the same counsel. In fact, when the matter came up again at the sentencing hearing, the court reminded Evans, "But you went through the trial. And even at the end I asked you whether or not you wanted Mr. Monta off the case. And you proceeded to the conclusion. Right?" To which Evans responded, "Right."
 {¶ 53} Similarly, it is unclear how much further Evans thought the judge's questioning should have gone when he complained that two jurors had seen him being escorted in the hall by uniformed police officers during a lunch break. The record indicates that a complete inquiry was made of the court personnel involved and of Evans' father, who saw the event. While the jurors did see Evans in the company of two uniformed deputies, there was never any mention made of Evans being taken to jail. Moreover, there was no reason to conclude that the two jurors would presume that Evans must be guilty merely because he was seen in the presence of uniformed police officers.
 {¶ 54} Because Evans was not denied a fair trial, his fourth assignment of error will be overruled.
 VI {¶ 55} The sentence will be reversed, and the matter will be remanded for re-sentencing. The trial court's judgment will be affirmed in all other respects.
Fain, J. and Donovan, J., concur.